**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **JOYCE MOORE-STOVALL, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **No. 10-2643-KHV** |
| | ) | |
| **ERIC SHINSEKI,** | ) | |
| **Secretary of Veterans Affairs,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

Plaintiff asserts Title VII claims against her former employer, the Veterans Administration. Plaintiff alleges that defendant took adverse employment actions against her because of sex, race and national origin and in retaliation for her complaints of discrimination.[1]  This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #74) filed February 19, 2013.  Defendant seeks summary judgment on all of plaintiff's claims, arguing that (1) it did not take adverse action against plaintiff, (2) to the extent that it did take adverse action, it did so for legitimate business reasons and (3) plaintiff cannot show pretext.  For reasons set forth below, the Court finds that defendant's motion should be sustained.

**I.      Summary Judgment Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material

---

[1]      Plaintiff also asserted Title VII claims for racial harassment, sexual harassment and national origin harassment and a claim under the Equal Pay Act.  The pretrial order does not include an Equal Pay Act claim and in response to defendant's motion for summary judgment, plaintiff has abandoned her Title VII harassment claims.  See Pretrial Order (Doc. #66) filed December 20, 2012; Plaintiff's Response To Defendant's Motion For Summary Judgment And Suggestions In Opposition (Doc. #96) filed May 3, 2013, at 46.

fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A "genuine" factual dispute is one "on which the jury could reasonably find for the plaintiff," and requires more than a mere scintilla of evidence. Liberty Lobby, 477 U.S. at 252. A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Id. at 248.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1085 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to show that a genuine issue remains for trial with respect to the dispositive matters for which she carries the burden of proof. Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 739 (10th Cir. 2004); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). As to these matters, the nonmoving party may not rest on her pleadings but must set forth specific facts. Fed. R. Civ. P. 56(e)(2); Matsushita, 475 U.S. at 586-87; Justice, 527 F.3d at 1085. Conclusory allegations not supported by evidence are insufficient to establish a genuine issue of material fact. Jarvis v. Potter, 500 F.3d 1113, 1120 (10th Cir. 2007); see Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 853 (10th Cir. 1996).

When applying this standard, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment. Duvall v. Ga.-Pac. Consumer Prods., L.P., 607 F.3d 1255, 1260 (10th Cir. 2010). The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. Essentially, the Court asks "whether the evidence presents a sufficient disagreement to

require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## II.    Facts[2]

The following facts are undisputed or construed in a light most favorable to plaintiff.

Plaintiff is an African-American female who describes her national origin as "African-American American." She is a board certified radiologist. Plaintiff worked at the VA Medical Center in Leavenworth, Kansas from July of 1979 until July of 2008. The VA Medical Center is part of the Eastern Kansas Health Care System ("EKHCS"). During the relevant times, Dr. Jafar Amini, M.D. was Chief of Radiology in Leavenworth and was plaintiff's immediate supervisor. Dr. Muralidhara Rao, M.D. was Service Line Manager for radiology and laboratories, and was plaintiff's second level supervisor. Dr. Rao began working at EKHCS in 1974. He has never worked with a female radiologist other than plaintiff or supervised any other African-American radiologist.

### Productivity Issues

In September of 2004, Dr. Rao removed plaintiff from reading neurological MRIs. Dr. Rao testified that he did so because plaintiff had missed a number of diagnoses involving neurological MRIs and he wanted to improve MRI reports.

On October 11, 2005, Dr. Rao sent each EKHCS radiologist a memorandum with his or her projected Relative Value Unit ("RVU") productivity for 2005.[3] Plaintiff's projected annual

---

[2]    The Court has attempted to distill the relevant facts from the parties' numerous detailed fact statements.

[3]    To measure radiologist productivity, the VA uses Relative Value Units ("RVUs") for
(continued...)

productivity was 2,543 RVUs, at the low end of all of the radiologists. Dr. Rao set a goal for each staff radiologist to exceed 5,000 RVUs in fiscal year 2006.

After she received the memorandum, plaintiff complained to Dr. Rao that her RVU numbers were low because she had fewer opportunities than other radiologists to read certain modalities. On January 19, 2006, Dr. Rao met with plaintiff to discuss how to increase her RVU numbers. They agreed that plaintiff would read all CTs, MRIs and plain films after Dr. Amini left for the day at approximately 2:00 p.m. Dr. Amini, however, later told the technicians not to let plaintiff read the CTs and MRIs and told plaintiff to leave them for him to read the next day. After the meeting on January 19, 2006, plaintiff did not always read available CTs.

**New Salary Determinations In 2006**

The parties' fact statements contain no details about how the VA determined physician salaries before 2006. It apparently involved a lock-step salary computation based upon job description, tenure and job grade. See Memorandum (Doc. #75-64).[4] On January 8, 2006, the VA

_____

[3](...continued)
different types of radiological studies. MRIs and CTs have higher RVU values than X-Rays or plain films.

[4]     The VA Memorandum which sets out the major provisions of the new pay plan provides limited information about the prior plan, as follows.

> This new pay system became effective on January 8, 2006. The course of action for conversion consisted of three distinct processes:
>
> a. Effective January 8, 2006, all physicians and dentists received a 2.1 % increase on their existing rate of base pay resulting from the 2006 annual pay adjustment as well as any tenure and/or within grade increases that may have been applicable under the existing pay system.

(continued...)

implemented a new pay system for physicians based on three components: (1) base pay determined by years in the VA system[5] (2) market pay based on local salary rates and the VA's need to recruit/retain that particular physician and (3) performance pay for meeting certain goals and

---

[4](...continued)
      b. Additionally, after the 2.1 % annual adjustment and any applicable tenure and/or within grades increases were applied, the sum of base pay plus special pay for all physicians and dentists was converted to a rate of base pay on the new Base and Longevity Pay Schedule based on the physician's or dentist's years of VHA service. The remaining dollars then became market pay. Thus the market pay established on conversion was the amount of pay that remained after calculating the base pay.

      c. The last step of the conversion process required that all physicians and dentists have a market pay review performed by a Compensation Panel. All Compensation Panel reviews of market pay were to have been completed by April 7, 2006.

Doc. #75-64.

[5]

| STEP | TENURE (in years) | SALARY |
|------|-------------------|----------|
| 1 | 2 or less | $90,000 |
| 2 | 2 to 4 | $93,000 |
| 3 | 4 to 6 | $96,000 |
| 4 | 6 to 8 | $99,000 |
| 5 | 8 to 10 | $102,000 |
| 6 | 10 to 12 | $105,000 |
| 7 | 12 to 14 | $108,000 |
| 8 | 14 to 16 | $111,000 |
| 9 | 16 to 18 | $114,000 |
| 10 | 18 to 20 | $117,000 |
| 11 | 20 to 22 | $120,000 |
| 12 | 22 to 24 | $123,000 |
| 13 | 24 to 26 | $126,000 |
| 14 | 26 to 28 | $129,000 |
| 15 | more than 28 | $132,000 |

Doc. #77-10.

objectives.  The VA designed the new pay system to recruit and retain qualified physicians by

offering competitive pay.  To implement the new system, the VA set up Compensation Panels to

conduct a market pay review and recommend pay adjustments.

Dr. Rao testified that the Compensation Panel recommended the market pay for each

physician based on eight non-discriminatory factors, including years of experience in a speciality

or assignment, need for the speciality at the facility, health care labor market for the speciality, board

certifications, accomplishments in the speciality, prior VA experience, cost-of-living and other

considerations.[6]  The VA instructed Panel members not to consider factors such as race, gender,

---

[6]        Defendant's Statement of Fact ("SOF") Number 51 states as follows:

> The Compensation Panel reviewed each physician, made pay recommendations based upon non-discriminatory factors that included the years of experience, training, job duties, and the relative difficulty in recruiting and retaining a given specialty in a particular geographic area.  Rao 1:104:14-1:105:21; Rao 1:123:2-1:124:12; Rao 1:136:9-1:136:19; Rao 1:145:22- 1:145:24; see VA798-800 (listing factors to consider).

Memorandum Of Points And Authorities In Support Of Defendant's Motion For Summary Judgment (Doc. #75) filed February 19, 2013, at 21.  Plaintiff's response to SOF 51 is "Controverted.  The term 'based upon non-discriminatory factors' is argumentative and not a statement of fact." Plaintiff's Response To Defendant's Motion For Summary Judgment And Suggestions In Opposition (Doc. #96) filed May 3, 2013 at 10.  Defendant replied as follows:

> Plaintiff's assertion that this SOF is argumentative by asserting that the term "based upon non-discriminatory factors" is argumentative is erroneous.  It is an assertion of fact – that the actions of the Compensation Panel did not use discriminatory factors when making pay recommendations, and then enumerating the legitimate non-discriminatory factors that were considered.  Plaintiff fails to controvert this SOF with any evidence that goes to the substance of the SOF and it should, therefore, be deemed admitted.  Fed. R. Civ. P. 56(c)(1); D. Kan. Rule 56.1.

Defendant's Reply In Support Of Its Motion For Summary Judgment (Doc. #103) filed May 31, 2013, at 23-24.  The Court finds that defendant's SOF 51 is perhaps argumentative and certainly is conclusory.  The Court does not deem SOF 51 uncontroverted and therefore does not consider it in

(continued...)

prior EEO activity and national origin. After the Panel made pay recommendations, the relevant area Director determined each physician's pay, taking into consideration the funding required for all clinical specialties at the particular medical center.[7]

On February 27, 2006, EKHCS held a Compensation Panel review of its radiologists. Dr. Rao was the only radiologist on the panel. The Panel made salary recommendations to EKHCS Director Robert M. Malone, Jr., an African-American male from the United States. Malone then set the salary for each radiologist.

In 2006, Dr. Rao was the Service Line Manager for more than 85 radiology and laboratory employees in Topeka and Leavenworth. Dr. Rao also read nuclear medicine and sonography studies. In the Leavenworth radiology department, Dr. Amini, who worked part-time, supervised plaintiff and also performed diagnostic and therapeutic radiology. Plaintiff worked full time and performed only diagnostic work.[8]

In the Topeka radiology department, Dr. Sudhir Arumanla supervised Dr. Rao Chigurupati and Dr. Mark Greenberg, and also performed diagnostic and therapeutic radiology. Dr. Arumanla worked full time. Dr. Chigurupati practiced only diagnostic radiology and worked full time;

---

[6](...continued)
ruling on the motion for summary judgment.

[7]     The Compensation Panel did not consider the financial solvency of a medical center, and therefore the Director's final pay decision could be less than the recommendation.

[8]     Plaintiff practiced only diagnostic radiology, although she was also was certified to practice therapeutic radiology. In the VA health care system, therapeutic radiologists perform more complex types of procedures which involve greater risk and require more skill, training, clinical privileges, independent judgment and even slightly more physical exertion. The national survey which the Panel used to guide their salary recommendations indicated that therapeutic radiologists tended to earn about $4,000 more annually than diagnostic radiologists.

Dr. Greenberg practiced diagnostic and therapeutic radiology and worked part-time.

Plaintiff was the only female radiologist at EKHCS. Dr. Amini, an Iranian/Middleasterner, is from Iran; Dr. Arumanla and Dr. Chigurupati are Asians from India; and Dr. Greenberg is a Caucasian from the United States.

The Panel recommended raising the salary of Dr. Rao, who was Service Line Manager for radiology and laboratories, from $189,957 to $225,000 – an 18.45 per cent increase. Dr. Rao had 31 years of experience with the VA and was board certified in internal medicine and nuclear medicine. Director Malone approved a final salary of $215,000 – a 13.18 per cent increase.

The Panel recommended raising the salary of Dr. Amini, who was Chief of Radiology in Leavenworth, from $181,557 to $220,000 – a 21.17 per cent increase. Dr. Amini had 18 years of experience with the VA and was board certified in radiology. Director Malone approved a final annual salary of $215,000 – an 18.42 per cent increase.

The Panel recommended raising the salary of Dr. Arumanla, who supervised the Topeka radiology department, from $169,957 to $215,000 – a 26.50 per cent increase. Dr. Arumanla had one and a half years of experience with the VA and was board certified in radiology. Director Malone approved a final annual salary of $200,000 – a 17.68 per cent increase.

The Panel recommended raising plaintiff's annual salary from $184,957 to $200,000 – an 8.13 per cent increase. Plaintiff had 26 years of experience with the VA and was board certified in radiology. Director Malone approved a final salary of $195,000, two and one half per cent lower than the recommendation (a 5.43 per cent increase). Malone knew that plaintiff was female, but did not know her race, national origin or prior EEO activity.

The Panel recommended that Dr. Chigurupati's annual salary of $165,957 remain unchanged.

Dr. Chigurupati had 19 years of experience with the VA and was not board certified in any speciality. Director Malone approved the Compensation Panel's recommendation.

The Panel recommended that Dr. Greenberg's annualized salary be raised from $161,957 to $190,000, for an increase of 17.32 per cent.[9] Dr. Greenberg had three years of experience with the VA and was board certified in radiology. Director Malone approved the Compensation Panel's recommendation.

Dr. Rao testified that Drs. Amini, Arumanla and Greenberg performed higher quality work than plaintiff and that Drs. Amini and Arumanla consistently produced more RVUs than plaintiff. Dr. Rao testified that the panel believed that Drs. Arumanla and Greenberg were more likely than plaintiff to leave the Topeka VA, in part because plaintiff had worked for the VA since 1979 and had not indicated that she was likely to seek other employment.

### Plaintiff's Performance Ratings

For the fiscal year ending September 30, 2006, Dr. Rao gave plaintiff a "High Satisfactory" performance rating. Doc. #75-22. Dr. Rao noted, however, that plaintiff's 2005 calendar year productivity was only 2,543 RVUs – just over half the annual goal. For the first seven months of 2006, plaintiff produced 1,998 RVUs, which equated to 3,425 RVUs per year. In response, plaintiff asserted that she deserved an "Outstanding" rating, but Dr. Rao did not change her rating.

In the spring of 2006, the VA implemented the new pay system, including Performance Pay as an incentive. Plaintiff's Performance Pay plan for July 1 through September 30, 2006 included

---

[9]     Dr. Greenberg was a part-time employee, so his salary was prorated.

only one goal: to produce 1,250 RVUs.[10]  Doc. #75-20.  If plaintiff met this goal, she could earn an

additional $5,000.  Drs. Chigurupati and Greenberg had identical Performance Pay plans.  For July 1

through September 30, 2006, plaintiff produced 897.94 RVUs, so she earned no Performance Pay.

Drs. Greenberg and Chigurupati also failed to qualify for Performance Pay for that period.  Id.

Plaintiff's Performance Pay plan for October 1, 2006 to September 30, 2007 contained six

performance goals, including to read 95 per cent of studies within 48 hours – a goal which applied

to all radiologists in the EKHCS.

**Written Counseling On November 28, 2006**

On November 28, 2006, Dr. Rao issued plaintiff a "Written Counseling" for failure to timely

respond while she was on call and then falsely denying that the VA had followed proper procedures

to contact her.  Doc. #75-46.  The Written Counseling addressed an incident in October of 2006,

when the administrative officer on duty ("AOD") had tried to contact plaintiff to read a patient

X-ray.  The AOD called plaintiff's home at 10:00 a.m., but the person who answered told the AOD

to call plaintiff's government-issued cell phone.  When the AOD called the government-issued cell

phone "the message received was 'user unavailable.'"  Doc. #75-48.  The AOD also called

plaintiff's pager, but plaintiff did not respond.  The AOD then called Dr. Rao who also tried to reach

plaintiff.  By the time plaintiff responded at 1:00 p.m., another doctor had read the X-ray.  The AOD

told Dr. Rao that "[t]his has occurred several times this year with Dr. Stovall."  Doc. #75-33 at 1.

On November 1, 2006, Dr. Amini told plaintiff that he expected her to promptly respond

when she was on call.  Plaintiff responded in writing as follows:

---

[10]      Plaintiff's Performance Pay plan for July through September of 2006 included the
following incentives: 1,250 RVUs – $5,000; 1,125 RVUs – $2,500; 1,000 RVUs – $1,000.  Doc.
#75-20.

I dispute the accusation by the AOD that she attempted to contact me on the government-issued cell phone. . . . It is unrealistic for management to expect for me to return calls to doctors when I am on call if I am not notified through the correct channels by the AOD.

Doc. #75-47. Dr. Rao reviewed telephone logs from the hospital and plaintiff's government-issued cell phone and concluded that the AOD had attempted to reach plaintiff at her home phone, her government cell phone and by pager.

**Denial Of Plaintiff's Request For Training In November Of 2006**

On November 20, 2006, plaintiff requested approval from the Core Pit Committee for $3,500 for advanced training for multi-slice cardiovascular CTs. The VA policy allowed each physician up to $1,000 per year for training. Plaintiff had already received her allotment of training for that year and she had received CT training from the Philips Company. The Committee denied plaintiff's request for training.

**Letter Of Admonishment In April Of 2007**

At noon on Saturday, February 17, 2007, plaintiff was on call when she was notified to read CT scans of an emergency room patient. Technical problems delayed the download to plaintiff's home computer, and by 2:00 p.m. only half of the images had transferred. Dr. Ferrell, the ER doctor, called to ask plaintiff to come to the hospital. Plaintiff responded, "I have a life" and told him that she was not coming in because she had been at the hospital late the night before. Doc. #75-28. Nearly six hours after the CT, plaintiff gave Dr. Ferrell a verbal reading. Dr. Ferrell later told Dr. Rao that plaintiff's reading missed acute appendicitis and was grossly inadequate.

On March 7, 2007, Dr. Rao issued plaintiff a Proposed Admonishment because of her "rude, unprofessional and unacceptable response." Doc. #75-27. Plaintiff replied that the digital system had repeatedly malfunctioned. She admitted that she had told Dr. Ferrell that it was not her problem,

and that it was not her responsibility to ensure that the digital systems are operational. Plaintiff repeated that "I do have a life" and stated that she had exercised professional judgment when she refused to go to the hospital. Doc. #75-45 at 2-3. Dr. Rao found that plaintiff's response to Dr. Ferrell's request was inappropriate and issued a Letter of Admonishment. Doc. #75-26.

### July 16, 2007 Incident Regarding Investigation Of Plaintiff's Use Of CDs For Patient Medical Records

On April 17, 2007, plaintiff sent the Field Information Security Officer a request to "store, transport and utilize VA sensitive information outside protected environments."[11] Doc. #75-43. The justification for the request stated that the information would be used "[f]or ON CALL coverage that is provided from home." Id. at 1. On May 16, 2007, Information Security Officer ("ISO") Earl Hatcher sent plaintiff an email which stated that "Your Authorization to transport and utilize VA sensitive information outside protected environments is approved. Please take the proper precautions when transporting or transmitting data off site." Doc. #75-11. Dr. Rao testified that this "authorization is to access images from home while on call for radiology purposes, and no other approval." Doc. #75-6 at 21.

Shortly before July 16, 2007, Dr. Rao learned that plaintiff had directed a radiology clerk to

---

[11]     Plaintiff's request referred to VA Directives 6601 and 6504, and affirmed that her request for authorization complied with those directives. VA Directive 6601 defines sensitive information to include all department data that requires protection from disclosure "on any storage media or in any form or format," including "records about individuals requiring protection under various confidentiality provisions such as the Privacy Act and the HIPAA Privacy Rule" such as "individually identifiable medical . . . information." Doc. #75-65 at 3-4. VA Directive 6504 governed "VA employees' transmission, transportation, and use of, and access to, VA data outside VA facilities," Doc. #75-67 at 1, and states "VA employees are permitted to transport, transmit, access and use VA data outside VA facilities only when such activities have been specifically approved by the employee's supervisor" and where adequate security measures have been taken. Id.

prepare CDs containing patient studies. Dr. Rao asked the clerk to stop preparing the CDs because of restrictions regarding transfer of patient medical records. Dr. Rao's Administrative Officer, Jeannie Idol, then told ISO Hatcher that plaintiff was asking for disks with sensitive information and that Dr. Rao did not know why.[12] Hatcher was responsible for protecting information at the VA and investigating security issues. Hatcher contacted the radiology clerk, who told him that the CDs "had to do with training." Doc. #75-10 at 6. This was a red flag to Hatcher because he believed that plaintiff was not authorized to take sensitive information home for training purposes. Hatcher explained the issue to Marie Weldon, the Director of EKHCS, who told him that "we need to talk to Dr. Stovall." Id. at 7. Hatcher also contacted Barbara Murphree, the Privacy Officer, who was responsible for investigating privacy breaches. Director Weldon asked Murphree to go to Leavenworth to investigate the CDs.

Murphree contacted Dr. Rao and told him that Weldon had instructed her to interview plaintiff and confiscate the CDs. On July 16, 2007, Murphree went to the radiology department in Leavenworth. Dr. Rao introduced Murphree as the Privacy Officer and told plaintiff that Murphree wanted to talk to her. Plaintiff told Dr. Rao that she was busy reading radiographic studies, but that she would meet with Murphree after she had finished.

When plaintiff finished her work, Murphree followed plaintiff to her office, and said "Give me the CDs." Murphree told plaintiff that she was there at the Director's request and needed to know if plaintiff had authority to burn the CDs. Plaintiff told Murphree to leave so she could make a phone call. Murphree continued to ask plaintiff about the CDs in a very rude and aggressive

---

[12]     Dr. Rao testified that he had not had an opportunity to ask plaintiff why she was burning CDs before the incident on July 16, 2007. Before July 16, 2007, Dr. Rao had never talked to plaintiff about the CDs.

manner.  Murphree tried to grab the briefcase that plaintiff was holding, grabbed plaintiff's arm and then yelled when plaintiff pulled her briefcase back.  In response to the raised voices, Idol arrived and told plaintiff that Murphree had orders from administration to get into her office.  VA security officers arrived, and at that point, plaintiff had pushed Murphree out of the office.  The officers directed everyone to come out, but plaintiff quickly shut the door, pinching Murphree's hand between the door and the jamb.  When the officers got the door open, Dr. Rao had just arrived and asked plaintiff to cooperate.

The security officers escorted plaintiff to the security office, where plaintiff gave the CDs to the VA Police Chief and returned to her office.  There, she found Murphree reviewing her podiatry teaching records for original hard copy medical records.  Murphree removed approximately eight documents from plaintiff's office, verified that two were original medical records and returned them to the original medical record files.

### Plaintiff's Medical Leave

Following the incident on July 16, 2007, plaintiff took medical leave.  Her physician, Dr. E. Kent Stevenson, determined that beginning July 23, 2007, plaintiff was totally temporarily disabled.  Dr. Stevenson diagnosed plaintiff with PTSD and identified the incident of July 16, 2007, as "clearly causing her extreme distress," stating that it "has lead to insomnia, bad dreams [and] anxiety."  Doc. #96-15.  Five months later, on December 14, 2007, Dr. Stevenson determined that plaintiff could return to work on January 3, 2008.  Id.

### Plaintiff's November 13, 2007 Proficiency Rating

Plaintiff's Proficiency Reports for 1999 to 2006 were all positive, with no ratings below Satisfactory.  On November 13, 2007, Dr. Amini issued a Proficiency Report for plaintiff for the

period of October 1, 2006, through September 30, 2007. Doc. #75-19. He gave plaintiff an overall rating of Satisfactory, a High Satisfactory in Clinical Competence and Education Competence, and a Low Satisfactory for the "Personal Qualities" element. The "Personal Qualities" element considers the employee's "emotional stability, dependability, relations with staff and community, eliciting cooperation, handling groups and adherence to ethical standards." Id. at 1. The Proficiency Report, which Dr. Rao approved, specifically noted "several incidents that occurred in this rating period result[ing] in a rating of low satisfactory." Id. Dr. Rao explained that the incidents included (1) the written counseling on November 28, 2006, regarding plaintiff's false statements about efforts to contact her while she was on call, (2) plaintiff's failure to properly read the CT of Dr. Ferrell's E.R. patient with appendicitis and (3) plaintiff's failure to comply with VA policies regarding CDs with patient medical information and her failure to cooperate with the investigation on July 16, 2007.

**Plaintiff's Return To Work**

When plaintiff returned to work on January 3, 2008, she had 238 plain films to read, some of which were from November. Plaintiff read them all, which counted against her requirement to read them within 48 hours.[13]

On January 4, 2008, plaintiff confirmed that she had taken the CDs off the VA campus. Plaintiff stated that she had directed the clerk to burn CDs of certain patient files with interesting

---

[13]    Defendant points out that plaintiff was not responsible for meeting the 48-hour turnaround goal for any radiographic studies she read for Topeka. Plaintiff has not pointed to any evidence concerning how many of the 238 films were for Topeka.

cases to use for teaching podiatry residents.[14]  After plaintiff confirmed in writing that she had

removed sensitive information from the VA, Mr. Hatcher put in an incident ticket to Central Office.

Plaintiff admitted that the only possible authorization to transport the CDs off VA premises

was the memorandum dated April 17, 2007 and the email from Mr. Hatcher.  On March 7, 2008,

Dr. Amini issued plaintiff a memorandum of Written Counseling.  The Written Counseling stated

that "[s]pecific written authorization is required to carry information off-station," and that plaintiff

"failed to meet my expectations with regard to safeguarding confidential materials."  Doc. #75-25.

### Overtime In June And July Of 2008

In June of 2008, Dr. Amini left 88 of his general radiology studies unread before he took

leave for several days.  Plaintiff read them without assistance from others.  She worked 15 hours a

day for several days to meet the 48-hour turnaround time without receiving overtime pay or

compensatory time.  On July 17 and 18, 2008, plaintiff worked 13 hours per day to meet the 48-hour

turnaround time.  On June 14 and 21, and July 5, 20, 26 and 27, 2008, plaintiff worked weekends

so that she could complete 95 percent of her studies within the 48-hour turnaround time.  As a VA

physician, plaintiff was ineligible for overtime pay or compensatory time and she did not know of

---

[14]     Dr. Rao questioned plaintiff's justification for making the CDs.  For example, Dr. Rao knew that the VA had been filmless (i.e. digital) for more than six years by the time plaintiff began having CDs burned, so when the investigation revealed that plaintiff had begun burning CDs for podiatry residents for less than one year, even though she had been collecting X-rays to teach podiatry residents since 1978, it led him to doubt that Plaintiff was actually using the CDs for the stated purpose.  Further, the CDs contained MRIs of the head which, in Dr. Rao's opinion, were not necessary to training podiatry residents.  Also, Dr. Rao believed that CDs were not necessary to train podiatry residents because training took place on the VA campus where plaintiff had access to all of the images without using CDs.  Plaintiff testified, however, that she used these CDs for training of residents and for research.

any physician who actually received compensatory time or overtime between 2005 and 2008. No one ever directed plaintiff to work weekends or late hours in order to meet the 48-hour turnaround goal.

### Plaintiff's Separation From Employment

On June 27, 2008, plaintiff sent an email to Drs. Rao and Amini stating that she had completed a retirement application. Plaintiff retired on July 31, 2008.

Before July of 2008, plaintiff had contemplated retiring as soon as she became eligible. On January 21, 2008, Dr. Stevenson noted that plaintiff said she would have 30 years in July; on February 18, 2008, he noted that plaintiff's goal was to retire; on April 14, 2008, he noted that plaintiff could possibly retire in July of 2008; on May 27, 2008, he noted that plaintiff had indicated that she was going to retire from the VA on July 31, 2008, so that she could work as a radiologist elsewhere.

Plaintiff testified that at some point after she first returned to work in January of 2008, she decided to retire. Plaintiff explained that she was feeling the stress of having to work on weekends and be on call, and that she felt stress pain in her arm and had ulcers and gastric upset. Plaintiff testified that she decided that in order to continue to provide the best care possible for her patients without mis-diagnoses, that it would be best for her to retire. She made the decision because of the physical and emotional stress that she was under. Plaintiff stated that she retired because she was afraid of not providing proper patient care. In an employment application on January 7, 2011, plaintiff certified that she had never been discharged from any position for any reason.

Dr. Rao denied that he took any action to force plaintiff to retire. After plaintiff informed

Dr. Rao by email that she was retiring, he never had a conversation with her.

**Administrative Complaints**

On November 18, 2005, Dr. Rao learned that plaintiff had contacted the VA Office of Resolution Management with a complaint of discrimination which named him as the responding management official. On December 20, 2005, plaintiff filed an EEOC charge ("Claim 303") which alleged discrimination based upon gender, race and national origin. Highly summarized, Claim 303 asserted disparate treatment regarding assignment of duties which made it more difficult for plaintiff to achieve the quota of RVUs as compared to her co-workers.

On August 11, 2006, plaintiff filed another EEOC charge ("Claim 822") which alleged discrimination based upon gender, race, national origin and retaliation, and violation of the Equal Pay Act. In short, Claim 822 asserted that on May 17, 2006, the VA gave male doctors higher pay increases than plaintiff.

On December 26, 2006, plaintiff filed a third EEOC charge ("Claim 408") alleging gender, race and national origin discrimination, and retaliation based on (1) her performance pay for 2006; (2) denial of her request to re-allocate accrued annual and sick leave balances; (3) disciplinary actions including a Written Counseling on November 28, 2006; (4) disparate treatment in duty assignments, including a 48 hour turn-around requirement effective December 16, 2006, and peer review process restrictions on December 15, 2006, and (5) denial of her request on November 20, 2006, to attend advance Cardiac CT training.

On January 3, 2009, plaintiff filed a fourth EEOC charge ("Claim 508") alleging gender, race and national origin discrimination and retaliation because defendant (1) assigned plaintiff to "7 days

on and 7 days off" on-call coverage in July and August of 2008 while her male counterparts received more days off; (2) forced plaintiff to retire on July 31, 2008; (3) required plaintiff to work 13 hours per day on July 17 and 18, 2008, to meet the 48-hour turnaround time; (4) assigned plaintiff to cover the Leavenworth and Topeka VA hospitals from July 14 at 4:30 p.m. through July 21, 2008 at 8:00 a.m.; (5) failed to provide plaintiff assistance when Dr. Amini was on leave; (6) required plaintiff to work several weekends in the summer of 2008 to meet the 48-hour turnaround time but did not require male radiologists to do so; (7) in June of 2008, failed to provide plaintiff assistance when Dr. Amini took leave for several days; (8) interrupted plaintiff on March 4, 2008, when she was reading high RVU studies; (9) on January 3, 2008, told plaintiff that if she did not answer the questions of an HR representative, she would not receive access to the VA computers to do her job; (10) on November 13, 2007, issued plaintiff a "Low Satisfactory" proficiency report; (11) on July 16, 2007, orchestrated an incident involving an administrative investigation that resulted in plaintiff having to seek treatment for job-related stress and continued to make plaintiff's work environment stressful, ultimately forcing her to retire on July 31, 2008.

On November 29, 2010, plaintiff filed this lawsuit.

## III.    Analysis

Plaintiff asserts that defendant discriminated against her on the basis of race, gender and national origin, and retaliated against her for protected activity by taking the following actions: (1) giving her a comparatively low pay raise after the 2006 Compensation Panel; (2) confronting her on July 16, 2007 regarding CDs containing patient information; and (3) constructively discharging her. Defendant argues that it did not take adverse action against plaintiff and that even if it did, it

-19-

did so for legitimate business reasons and not because of sex, race or national origin or in retaliation for protected activity.

## A.    Title VII Discrimination Claims

Plaintiff may establish that defendant acted with discriminatory intent under Title VII either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973). See Jones v. Okla. City Pub. Schs., 617 F.3d 1273, 1278-79 (10th Cir. 2010).[15] Here, plaintiff relies on the indirect method of proving discrimination. Under the McDonnell Douglas burden-shifting framework, plaintiff has the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008). If plaintiff satisfies her burden, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. McDonnell Douglas, 411 U.S. at 802-03; Sanders, 544 F.3d at 1105 (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)). If defendant does so, the burden shifts back to plaintiff to show a genuine issue of material fact whether defendant's stated reason is pretextual, i.e. unworthy of belief. Sanders, 544 F.3d at 1105. If plaintiff so shows, she gets over the hurdle of summary judgment. Id.

To establish a prima facie case of race, sex or national origin discrimination under Title VII, plaintiff must show that (1) she is a member of protected class; (2) she suffered adverse employment

---

[15]    In Jones, the Tenth Circuit considered whether the McDonnell Douglas framework applied to ADEA claims after the Supreme Court's decision in Gross v. FBL Fin. Servs., Inc.,557 U.S. 167 (2009). Jones, 617 F.3d at 1278. It held that "Gross does not preclude our continued application of McDonnell Douglas to ADEA claims." Id.

action; and (3) the action took place in circumstances which give rise to an inference of discrimination.[16] Defendant concedes the first element of a prima facie case as to plaintiff's claims of race, sex and national origin, i.e. that plaintiff, a female African-American, belongs to each of these three protected classes. As to the second and third elements, defendant argues that it is entitled to summary judgment because plaintiff cannot show adverse employment action and cannot show that any such action occurred under circumstances which give rise to an inference of discrimination.

For purposes of a discrimination claim, adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007) (internal quotation omitted). The Tenth Circuit liberally defines the phrase "adverse employment action." Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, the Tenth Circuit takes a "case-by-case approach,"

---

[16]    The Tenth Circuit sometimes describes the prima facie case a bit differently, with four requirements. See, e.g., Luke v. Hosp. Shared Servs. Inc., 513 Fed. Appx. 763, 765 (10th Cir. 2013). "To set forth a prima facie case of discrimination, a plaintiff must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class." Id. The Tenth Circuit has acknowledged the differing explications of the test, as follows.

> We note that the district court evaluated [plaintiff's] prima facie case under an older, four-part test from the original McDonnell Douglas. We use a more recent variation of this test, a three-part test articulated by the Supreme Court in Burdine, which the Tenth Circuit expressly prefers. Sorbo v. United Parcel Serv., 432 F.3d 1169, 1173 (10th Cir. 2005). Similar variations of this test have also been applied in this circuit. E.g., Turner, 563 F.3d at 1142 (articulating a slightly different four-part test). Under all of these tests, the prima facie burden is "slight[.]"

Tabor v. Hilti, 703 F.3d 1206, 1216 n.4 (10th Cir. 2013).

-21-

examining the unique factors relevant to the situation at hand.  <u>Jones</u>, 617 F.3d at 1279; <u>see</u> <u>Plotke</u>

<u>v. White</u>, 405 F.3d 1092, 1100 (10th Cir. 2005) (no rigid rule about what circumstances allow

inference of discrimination).  Courts have enumerated a variety of circumstances that can give rise

to an inference of discriminatory motive, including preferential treatment of employees outside the

protected class.  <u>Plotke</u>, 405 F.3d at 1100.

### 1.     2006 Lower Pay Raise

#### a.     Adverse Employment Action

Defendant argues that plaintiff did not suffer adverse employment action when she received

a lower percentage raise than other radiologists after the 2006 Compensation Panel.  Defendant notes

that it increased plaintiff's pay, and that plaintiff was the highest paid non-supervisory radiologist

in the EKHCS who practiced only diagnostic radiology.  Neither party cites a case directly on point.

This Court has noted that receiving a lower raise than similarly situated employees can be adverse

employment action.  <u>Taher v. Wichita State Univ.</u>, 526 F. Supp.2d 1203, 1218 (D. Kan. 2007) (citing

<u>Amro v. Boeing Co.</u>, 232 F.3d 790, 798 (10th Cir. 2000)).  On this record, however, it is not clear

that any of the other radiologists were similarly situated to plaintiff.[17]  For the sake of argument, for

purposes of the motion for summary judgment, the Court assumes that defendant's decision to give

plaintiff a lower pay raise than board certified supervisory co-workers constituted adverse

employment action.

---

[17]     Plaintiff lumps together all radiologists, without regard to board certification, supervisory duties, and other factors which were relevant under the 2006 compensation plan, and focuses only on the percentage increase.  Since the 2006 compensation plan was not percentage-based, this focus does not necessarily suggest discriminatory intent.

### b. Circumstances Giving Rise To Inference Of Discrimination

As to the third element, defendant asserts that plaintiff cannot show a nexus between plaintiff's lower pay raise and her race, gender and/or national origin. Plaintiff points to evidence that the VA gave her a 5.43 per cent pay raise, while it gave raises of 13.18 to 17.68 per cent for male counterparts of different races and different national origins. Plaintiff also points out that before the 2006 Compensation Panel, she had earned the highest salary of all radiologists, and afterward she had a lower salary than all but Dr. Greenberg, who had only three years of experience compared to her 27 years. Plaintiff asserts that this circumstantial evidence suggests that the Panel recommended that she receive a lower salary increase because of race, gender or national origin. Although Director Malone made the final salary decisions, he based those decisions on Panel recommendations. Plaintiff therefore argues that defendant is liable for discrimination by the Panel, which Director Malone adopted.

As noted, Dr. Greenberg and plaintiff were the only non-supervisory certified radiologists. Director Malone adopted the panel recommendation for Dr. Greenberg's salary ($190,000), and adopted the panel recommendation ($200,000) minus $5,000 for plaintiff's salary ($195,000). Dr. Malone was himself African American and at the time he approved plaintiff's salary, he did not know her race, national origin or prior EEOC activity. His decision-making process, seen from the vantage point of what he knew at the time, does not raise an inference of discriminatory intent. Even though in terms of percentages or even absolute dollars, plaintiff received a lower increase than Dr. Greenberg, she still received a higher salary than he did (on a prorated basis). The base pay component of the compensation plan also took into account that plaintiff had longer tenure than

Dr. Greenberg.  The fact that the plan did not afford greater weight to tenure does not raise an inference of discriminatory intent.

Plaintiff essentially asserts that because she went from earning the highest salary to nearly the lowest salary among board-certified radiologists, she has shown circumstances which give rise to an inference of discrimination.  She ignores the fact that the VA adopted an entirely new compensation plan which replaced a compensation plan based primarily on length of service in the VA.  The new plan considered three components: (1) length of service in the VA system, (2) market pay, which included eight factors, and (3) performance pay.  Plaintiff has produced no evidence that the plan itself was a pretext for discrimination.  She does not claim that the Compensation Panel improperly calculated her length of service or that of Dr. Greenberg.  In challenging the Compensation Panel's application of the market pay component, which included the VA's assessment of its need to retain her services, plaintiff has not shown direct or circumstantial evidence that any Panel member except Dr. Rao knew her race, national origin or prior EEO activity, or considered those factors in making plaintiff's salary recommendation.  Nevertheless, for purposes of summary judgment, the Court assumes for the sake of argument that plaintiff has made the de minimis showing required for a prima facie case of gender, race and national origin discrimination.

### c.      Proffered Legitimate Non-discriminatory Reason

Defendant argues that it has set forth legitimate, nondiscriminatory reasons for plaintiff's raise.  Defendant asserts that the Compensation Panel followed the directive to determine salary based on nondiscriminatory factors including years of service, years of experience in a speciality or assignment, need for the speciality at the facility, health care labor market for the speciality, board

certifications, accomplishments in the speciality, prior VA experience, cost-of-living and other considerations. Defendant argues that the Panel applied these factors, and particularly considered job duties and recruitment and retention needs, to reach a recommendation as to each radiologists' pay raise. Further, Director Malone, who made the final decision, was African American and when he approved plaintiff's salary he did not know her race, national origin or prior EEO activity.

As to job duties, defendant notes that plaintiff had no supervisory responsibilities, whereas Dr. Rao was the Service Line Manager for EKHCS, Dr. Amini was Chief of Radiology in Leavenworth and Dr. Arumanla was the supervisor in Topeka. Further, Drs. Amini, Arumanla and Greenberg practiced both diagnostic and therapeutic radiology, whereas plaintiff practiced only diagnostic radiology, a lower-paid specialty. Thus, plaintiff was the only non-supervisory board certified radiologist who practiced only diagnostic radiology. She was therefore not similarly situated to any other radiologist. Moreover, Dr. Rao testified that Drs. Amini and Arumanla read more studies and produced higher quality work than plaintiff. Further, the Panel determined that Drs. Arumanla and Greenberg were more prone to leave the VA. Plaintiff, on the other hand, had worked for the VA in Leavenworth for decades and had not indicated that she was likely to seek other employment.

The Court finds that defendant has pointed to evidence of a legitimate, non-discriminatory reasons for the decision to give plaintiff a lower pay raise than other radiologists. The burden thus shifts back to plaintiff to show a genuine issue of material fact whether the VA's proffered reasons are a pretext for discrimination.

### d.    Pretext

Plaintiff can present many forms of evidence to establish that defendant's stated reasons are pretextual.  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000) (plaintiff need not pursue particular means of demonstrating stated reasons pretextual).  A plaintiff typically makes a showing of pretext in one of three ways, with evidence that (1) defendant's stated reason for the adverse employment action was false; (2) defendant acted contrary to a written company policy; or (3) defendant acted contrary to an unwritten policy or practice.  Id.  Plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Townsend v. Lumbermens Mut. Cas. Co., 294 F.3d 1232, 1242 (10th Cir. 2002) (citing Morgan, 108 F.3d at 1323).

Plaintiff primarily argues that the Panel's consideration of the likelihood that a physician might leave the VA ran counter to the eight factors it was to consider – in particular, the level of experience – and that "this change was significant and clearly was used to the detriment of [plaintiff]."  Plaintiff's Response To Defendant's Motion For Summary Judgment And Suggestions In Opposition (Doc. #96) filed May 3, 2013 at 59-60.  Plaintiff also points out that although defendant asserts that she did lower quality work than the other radiologists, in October of 2005 she had received an overall rating of "Outstanding" – the highest possible rating.  She also points out that diagnostic radiologists earned an average of only about $4,000 less per year than therapeutic radiologists, and thus the fact that she practiced diagnostic radiology did not justify a large disparity in pay increase.  Plaintiff asserts that defendant's proffered reasons are not believable, and that

"[there is] no doubt that impermissible reasons (race, sex and national origin) are the only remaining reasons that her pay was so dramatically lower" than her co-workers. Id. at 62.

Defendant argues that plaintiff has failed to demonstrate that its proffered reasons are a pretext for discrimination. Defendant notes that consideration whether a physician might leave is consistent with at least three of the prescribed factors: need for the specialty/assignment at the facility; health care labor market for the specialty/assignment; and other considerations. Defendant points out that Compensation Panel members were trained not to consider race, gender, prior EEO activity and national origin. Defendant also notes that the Panel did not consider the salary percentage increase because that number was not pertinent to its objective: to set a pay rate comparable to what the physician would earn outside the VA. Further, Dr. Malone (an African-American of United States origin) made the ultimate decision and he could not have based his decision on race or national origin because he did not know that plaintiff was an African-American from the United States. Holmes v. Potter, 384 F.3d 356, 362 (7th Cir. 2004) (usually, employer's lack of knowledge about protected category rings death knell for discrimination claims). Finally, defendant notes that experience was only one of eight considerations in determining market pay. Further, the Base and Longevity Pay Schedule took into account years of experience, and presumably plaintiff received all of the credit she deserved on that schedule.

Plaintiff points out that although Dr. Malone made the ultimate decision about the new pay rate for each radiologist, he either adopted the Panel recommendation (Drs. Chigurupati and

Greenberg) or lowered it by $5,000 (Dr. Amini), $10,000 (Dr. Rao) or $15,000 (Dr. Arumanla).[18]

Plaintiff cites evidence that she was the only woman, the only African-American and the only radiologist from the United States, and that despite being the most experienced, she went from being the highest paid to the lowest paid board certified radiologist. She argues that such evidence raises a genuine issue of material fact whether defendant's proffered reason was a pretext for discrimination. The Court disagrees.

To establish pretext, plaintiff must show weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in defendant's proffered reasons for its action such that a reasonable fact finder could rationally find them unworthy of credence and therefore infer that defendant did not act for the asserted non-discriminatory reasons. See Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005). Here, plaintiff does not offer evidence which discredits defendant's explanation for its decision regarding her pay raise. She does not contest the facts on which defendant's proffered reasons rest – that she had no supervisory responsibilities, that she practiced only diagnostic radiology, that Drs. Amini and Arumanla produced higher quality work and that

_____

[18]     At oral argument, plaintiff asserted that Dr. Rao had substantial influence on the Compensation Panel because he was the only radiologist on the Panel. The record contains no direct evidence, however, of any overt prejudice on the part of Dr. Rao. Cf. Shager v. Upjohn Co., 913 F.2d 398, 405-06 (7th Cir. 1990) (evidence that supervisor who recommended termination expressed animosity toward older workers and exaggerated plaintiff's performance deficiencies sufficient to withstand motion for summary judgment). The Tenth Circuit has adopted cat's paw liability in a Title VII case; an employer may be liable for the bias of a subordinate if plaintiff can show that the subordinate's discriminatory reports, recommendation or other actions caused adverse employment action. EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 487 (2006). Plaintiff must establish more than mere influence or input; she must show that the subordinate proximately caused the adverse action. Crowe v. ADT Security Servs., Inc., 649 F.3d 1189, 1194 (10th Cir. 2011). Here, plaintiff offers no evidence that Dr. Rao – who had worked with plaintiff for some 27 years when he sat on the Compensation Panel – had a discriminatory motive.

Drs. Arumanla and Greenberg were more prone to leave the VA. She does not offer evidence that defendant failed to follow its policy for making the pay determination. Rather, she relies exclusively on the fact that she is in a protected class. Plaintiff has failed to raise a genuine doubt about defendant's motivation or produce evidence refuting or showing that defendant's stated reasons for the decision regarding her raise were implausible, inconsistent or unworthy of credence. Stated another way, plaintiff's evidence is insufficient for a reasonable jury to find that defendant's proffered justifications were not the real reasons for the decision. The Court therefore finds that defendant is entitled to summary judgment on plaintiff's claims that the VA discriminated against her on the basis of race, sex and national origin in determining her pay raise in 2006.

### 2. July 16, 2007 Incident Regarding CDs

#### a. Adverse Employment Action

Defendant concedes for purposes of summary judgment motion that plaintiff suffered adverse employment action when Murphree confronted her about the CDs on July 16, 2007.

#### b. Circumstances Giving Rise To Inference Of Discrimination

Defendant argues that plaintiff has not shown any nexus between the CD incident and her race, gender or national origin. Plaintiff asserts that when Dr. Rao learned that she was having CDs burned, he should have discussed the situation with her, then told Murphree that plaintiff had authorization to take certain records off premises. She asserts that instead, Dr. Rao "dropped Ms. Murphree off at Dr. Moore-Stovall's office, left and let an avoidable and unfortunate series of events play out." Doc. #96 at 63-64. Plaintiff does not controvert the fact that she was not authorized to

burn the CDs or that the VA was justified in issuing the Written Counseling.[19]  Moreover, although plaintiff argues that Dr. Rao somehow orchestrated her confrontation with Murphree, defendant correctly pointed out at oral argument that it was plaintiff's response to Murphree's investigation which created the physical confrontation.  No reasonable jury could find any nexus between the CD incident and plaintiff's race, gender or national origin.

### 3.    Constructive Discharge

Plaintiff claims that the VA constructively discharged her by forcing her to retire on July 31, 2008, after plaintiff endured a "steady stream of conduct" including (1) reassigning high RVU work away from her; (2) instructing her not to read higher RVU work; (3) giving her the lowest salary increase in 2006; (4) giving her no performance pay; (5) refusing her request for training; (6) reducing her performance appraisals from "Outstanding" in 2005 to "High Satisfactory" in 2005-2006 to "Satisfactory" in 2006-2007; (7) in 2006-2007, rating plaintiff "Low Satisfactory" for "Personal Qualities" (the first "Low Satisfactory" rating she ever received); (8) subjecting plaintiff to the CD incident on July 16, 2007; (9) prompting plaintiff to take medical leave from July of 2007 to January of 2008; (10) requiring plaintiff to read 238 plain films in January of 2008; (11) disciplining plaintiff in March of 2008 for possessing the CDs involved in the incident on July 16, 2007 and (12) requiring plaintiff to work overtime and weekends in June and July of 2008

---

[19]     Defendant points to evidence that plaintiff had medical records transferred to CDs and removed the CDs from VA premises for purposes other than to provide on call patient care, even though she was not authorized to do so.  VA policy required officials to investigate possible security breaches.  Further, after Dr. Rao introduced Murphree to plaintiff as the Privacy Officer, plaintiff refused to answer Murphree's questions or to give her the CDs, and only then became involved in a physical confrontation.

to meet the 48 hour turn-around policy.

Defendant first points out that on January 7, 2011, plaintiff stated in an application for employment that she had never been discharged from any position for any reason. Defendant asserts that plaintiff therefore has admitted that she was not constructively discharged. The fact that plaintiff stated that she had never been discharged, however, does not compel the conclusion that she was not "constructively" discharged.[20]

In the alternative, defendant asserts that plaintiff has not provided facts that support the conclusion that she had no choice other than to resign. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Keller v. Crown Cork & Seal USA, Inc., 491 Fed. Appx. 908, 915 (2012) (quoting Pa. State Police v. Suders, 542 U.S. 129, 141 (2004)); see also Tran v. Trs. of State Colls., 355 F.3d 1263, 1270 (10th Cir. 2004) (constructive discharge occurs when reasonable person in employee's position would view working conditions as intolerable and feel she had no other choice but to quit). Under the objective test, "neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant." Tran, 355 F.3d at 1270.

Here, as a matter of law, the actions that plaintiff complains of did not rise to the level of an

---

[20]    Defendant also notes that in January of 2008, plaintiff began to contemplate taking retirement as soon as she became eligible in July of 2008.

intolerable situation that left her no choice except to resign. <u>See</u> <u>MacKenzie v. City & Cnty. of Denver</u>, 414 F.3d 1266, 1281-82 (10th Cir. 2005) (actions may have made plaintiff unhappy, but not every unhappy employee has actionable claim of constructive discharge). To the extent that plaintiff complains about discipline regarding the CD incident, she has not produced evidence that the discipline was unwarranted. Moreover, although plaintiff asserts that lowered performance reviews helped compel her to resign, negative performance evaluations do not establish constructive discharge without evidence that the reviews set the employee on a "dead-end path towards termination." <u>See</u> <u>Fischer v. Avanade, Inc.</u>, 519 F.3d 393, 412 (7th Cir. 2008). Further, although plaintiff asserts that the VA made her work environment unbearable by requiring her to work weekends and overtime and by reassigning higher value RVU work to others, a reassignment does not amount to a constructive discharge "unless the proffered employment options would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." <u>Rushton v. City of Warren</u>, 90 Fed. Appx. 912, 917 (6th Cir. 2004). A reasonable person in plaintiff's position would not find intolerable a requirement to work some evenings and some weekends. <u>See</u> <u>Sanchez v. Denver Pub. Schs.</u>, 164 F.3d 527, 534 (10th Cir. 1998) (while plaintiff no doubt found working conditions extremely difficult, and stress exacerbated her health problems, defendant's actions did not leave plaintiff with no choice but to resign). Plaintiff also cites her comparatively low raise in salary in 2006. Viewing all of these matters singly or in combination, plaintiff has not presented a genuine issue of material fact whether she objectively had no other choice but to quit and therefore felt compelled to resign. <u>See</u> <u>Baca v. Sklar</u>, 398 F.3d 1210, 1218 (10th Cir. 2005); <u>Monaco v. Quest Diagnostics, Inc.</u>, No. 08-2500-KHV, 2010

-32-

WL 3843622, at *15 (D. Kan. Sept. 24, 2010) (bar for constructive discharge quite high).

**B.    Retaliation**

Title VII makes it unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  To state a prima facie Title VII retaliation claim, plaintiff must show (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action materially adverse and (3) a causal connection between the protected activity and the materially adverse action.  Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012); see Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1176 (10th Cir. 2007) (to establish causal connection, plaintiff must show that individual who took adverse action knew of protected activity). If plaintiff so shows, the burden of production shifts to defendant.  If defendant offers a legitimate, nondiscriminatory reason for the adverse action, the burden shifts back to plaintiff to demonstrate that the proffered explanation is a pretext for retaliation.

Until recently, a plaintiff could establish causation by demonstrating that retaliation was a motivating factor in the employment act.  The Supreme Court recently held, however, that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013).[21]  This holding reconciles the causation standard for Title VII retaliation claims with the standard the

---

[21]    The Supreme Court issued the Nassar decision one day before oral argument on defendant's motion for summary judgment in this case.  The Court therefore directed the parties to file supplement briefs to address how Nassar impacts the analysis of causation in plaintiff's retaliation claim.

Supreme Court previously set out in the ADEA context in <u>Gross v. FBL Financial Services, Inc.</u>, 557 U.S. 167 (2009).[22]

Plaintiff asserts that defendant retaliated against her for EEOC complaints by taking the same employment actions on which she bases her claims of race, gender and national origin discrimination: (1) her less favorable pay raise after the 2006 Compensation Panel; (2) the July 16, 2007 confrontation about CDs containing patient information; and (3) constructive discharge based upon a series of events.

### 1.    Protected Opposition

Defendant concedes that plaintiff engaged in protected opposition by filing three EEOC charges: on December 20, 2005 (asserting discrimination in assignment of duties which made it difficult to obtain RVUs); on August 11, 2006 (asserting discrimination on May 17, 2006 when the VA gave male doctors of different races and national origin higher pay increases than plaintiff); and on December 26, 2006 (alleging discrimination as to performance pay, leave balances, multiple disciplinary actions including disparate treatment in duty and denial of training).

---

[22]    After <u>Gross</u>, the Tenth Circuit found that "the rule articulated in <u>Gross</u> has no logical effect on the application of <u>McDonnell Douglas</u> to age discrimination claims." <u>Jones v. Okla. City Pub. Sch.</u>, 617 F.3d 1273, 1278 (10th Cir. 2010). The Tenth Circuit noted that <u>McDonnell Douglas</u> "does not shift the burden of persuasion from the plaintiff to the defendant. Rather, it shifts only the burden of production." <u>Id.</u>; <u>see</u> <u>Cruces v. Int'l Down & Feather Testing Lab.</u>, No. 11-CV-984 TS, 2013 WL 3423259, at *10 (D. Utah July 8, 2013) (but-for causation standard set out in <u>Nassar</u> places higher burden on plaintiff than standard previously utilized in Tenth Circuit, but does not alter analysis at prima facie stage).

### 2. Adverse Employment Action

Unlike in disparate treatment cases, a materially adverse action for purposes of a retaliation claim need not affect the employee's terms and conditions of employment. <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 64 (2006) (adverse action for purposes of retaliation claim need not be "adverse employment action" as construed in Title VII discrimination cases). The employer's action must be materially adverse, however, to separate trivial harms from actionable injuries because Title VII does not establish "a general civility code for the American workplace." <u>See Somoza v. Univ. of Denver</u>, 513 F.3d 1206, 1212 (10th Cir. 2008) (citing <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)). Plaintiff must show that the challenged action could dissuade a reasonable employee from making or supporting a charge of discrimination. <u>Somoza</u>, 513 F.3d at 1214.

### a. 2006 Compensation Panel

As set forth in the analysis of plaintiff's discrimination claim, the Court assumes for sake of argument that plaintiff has set forth evidence that the 2006 salary decision was an adverse employment action. The Court also presumes that it meets the less exacting standard for a materially adverse employment action for a retaliation claim.

### b. July 16, 2007 Incident

As noted in the analysis of plaintiff's discrimination claim, defendant concedes for purposes of summary judgment motion that plaintiff suffered adverse employment action when Murphree confronted her about the CDs on July 16, 2007.

### c.　Constructive Discharge

Plaintiff claims that the VA constructively discharged her in retaliation for filing EEOC complaints. Plaintiff notes that she filed charges of discrimination on November 2, 2005, June 26, 2006 and November 9, 2006 before she retired July 31, 2008. She asserts that in retaliation for her protected activity, defendant forced her to retire by subjecting her to a "steady stream of conduct" including the 12 actions on which she bases her constructive discharge discrimination claim.[23] See Plaintiff's Brief Regarding Causation (Doc. #112) filed July 8, 2013, at 10. Plaintiff does not assert a separate retaliation claim based each of the 12 actions; rather, she asserts that taken together, defendant's conduct as a whole made working conditions so intolerable that a reasonable person would have felt forced to resign.[24] See Plaintiff's Response (Doc. #96) at 64-65; Plaintiff's Brief Regarding Causation (Doc. #112) at 11 (asserting that 12 incidents establish constructive discharge).

---

[23]　The factual bases for plaintiff's constructive discharge retaliation claim include (1) reassigning her to lower RVU work; (2) instructing her not to read higher RVU work; (3) giving her the lowest salary increase in 2006; (4) giving her no performance pay; (5) rejecting her request for training; (6) reducing her performance appraisals from "Outstanding" in 2005 to "High Satisfactory" in 2005-2006 to "Satisfactory" in 2006-2007; (7) giving her a "Low Satisfactory" rating in 2006-2007 for the category of "Personal Qualities; (8) subjecting her to the July 16, 2007 incident regarding CD's; (9) triggering her medical leave from July of 2007, to January of 2008; (10) in January of 2008, requiring her to read 238 plain films; (11) in March of 2008, disciplining plaintiff for possessing the CDs that were involved in the July 16, 2007, incident; and (12) requiring plaintiff to work overtime and weekends, in June and July of 2008, in an effort to meet the agency's 48-hour policy.

[24]　In response to defendant's motion for summary judgment on her retaliation claims, plaintiff incorporates her arguments regarding the discrimination claims. In addressing her constructive discharge discrimination claim, plaintiff argued that defendant engaged in an extended effort to separate her from her employment by subjecting her to "a steady stream of conduct aimed at discriminating and retaliating against her," and that "[t]hese incidents establish that the Agency constructively discharged [plaintiff]." Plaintiff's Response (Doc. #96) at 56.

For the reasons set forth in the Court's analysis of plaintiff's discrimination claims, the Court finds that plaintiff has not set forth facts on which on which a jury could find that defendant constructively discharged her.

### 3. Causal Connection

Plaintiff may show a causal connection with evidence of circumstances which justify inference of retaliatory motive, such as protected conduct followed closely by adverse action. Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004). Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). Otherwise, "plaintiff must offer additional evidence to establish causation." Id. As noted, after Nassar, plaintiff must show that the retaliatory motive was the but-for cause of the adverse action. Here, plaintiff engaged in protected opposition on December 20, 2005, August 11, 2006 and December 26, 2006.

### a. 2006 Compensation Panel

For the sake of argument, the Court assumes that defendant took an adverse employment action when it gave plaintiff a significantly lower pay raise than other board certified radiologists. Plaintiff must therefore establish a causal connection between her EEOC charge on December 20, 2005 and the decision regarding her pay raise.

On November 18, 2005, Dr. Rao learned that plaintiff was going to file an EEOC charge, and she did so on December 20, 2005. Although Director Malone made the final salary determination in June of 2006, plaintiff has presented evidence that he primarily based his decision on the Panel recommendation, and the Panel held its review on February 27, 2006. Dr. Rao participated in the

review, and at oral argument plaintiff asserted that as the only radiologist on the Panel, Dr. Rao had a great deal of influence on the Panel recommendation. Plaintiff did not, however, include that assertion in her statement of facts. In any event, plaintiff implicitly relies on a cat's paw argument – that Dr. Rao knew that plaintiff had filed a formal EEOC charge on December 20, 2005, and that on February 27, 2006, to retaliate for her protected conduct, he steered the Panel to recommend a lower raise for plaintiff than other radiologists.

As noted, the Tenth Circuit has adopted cat's paw liability in Title VII discrimination cases. See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 488 (2006). Plaintiff can hold an employer liable for the bias of a subordinate if plaintiff can show that the subordinate's discriminatory reports, recommendation or other actions caused adverse employment action. Id. at 487. Assuming that cat's paw liability applies to plaintiff's retaliation claim, plaintiff must first establish a genuine issue of material fact concerning the retaliatory motive of the subordinate, Dr. Rao. Id. at 488. Plaintiff must then establish a but-for causal relationship between the subordinate's actions and the employment decision.

Plaintiff offers no direct evidence that Dr. Rao – who apparently worked with plaintiff without incident for nearly three decades before any of the events described in this case – had a retaliatory motive.[25] Rather, she points out that before the compensation panel met on February 27,

_____

[25]     Plaintiff asserts that Dr. Rao was biased against her, as follows:

That Dr. Rao did not hold Dr. Moore-Stovall in high regard is evidenced by the fact that he chose to engage in a personal attack on her when he decided to support a low satisfactory rating for her "Personal Qualities" and refused to respond to Dr. Moore-Stovall's request for clarification for the basis of this rating, tersely

(continued...)

2006, Dr. Rao learned of the EEOC charge that she filed on December 20, 2005.  Plaintiff asserts

that this temporal proximity supports an inference that Dr. Rao had a retaliatory motive and

establishes a causal relationship between that retaliatory motive and the Panel's adverse

recommendation regarding her raise.  Courts have found that a one and one-half month gap may be

sufficient on its own to establish causation, while a delay of three months is not.  See Conner v.

Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (four month period between protected

activity and termination not sufficient in itself to infer causation); Anderson v. Coors Brewing Co.,

181 F.3d 1171, 1179 (10th Cir. 1999) (assuming two months and one week sufficient to support

prima facie case of retaliation, but not sufficient to overcome defendant's proffered reasons for

terminating her).  Here, the two to three month period between Dr. Rao's knowledge of plaintiff's

protected activity on December 20, 2005, and his participation in the Compensation Panel

recommendation on February 27, 2006, is sufficient to suggest a retaliatory motive on the part of

Dr. Rao.  Plaintiff has not produced any evidence, however, on which a jury could find that

---

[25](...continued)
instructing her to "sign and return proficiency report with your comments."  (SOF
414-416).  Similarly, as discussed above, Dr. Rao, knowing that a concern existed
regarding Dr Moore-Stovall's possession of the CDs chose to simply do nothing and,
by doing so, left her to her fate.  Perhaps the best insight into Dr. Rao's disdain for
Dr. Moore-Stovall is that, when she informed him in June of 2008, that she was
going to resign, he never said one word to her.  (SOF 473).  Keep in mind that she
continued to work well into July before she stopped working.  Additionally, Dr. Rao
and Dr. Moore-Stovall had worked together continuously from July of 1979 to July
of 2008, a period of 29 years.  (SOF 338).  Clearly, Dr. Rao had no interest
whatsoever in having even a professional relationship with Dr. Moore-Stovall or
even simply acknowledging that a longtime colleague was leaving her employment.

Plaintiff's Response Brief (Doc. #96) at 68.

Dr. Rao's retaliatory motive was the but-for cause of Director Malone's ultimate decision to give plaintiff a lower raise than other radiologists. See Nassar, 133 S.Ct. at 2521. Plaintiff has produced no evidence that Dr. Rao had any particular influence on the Compensation Panel. Further, plaintiff has produced no evidence that other members of the Panel, or the final decision maker, Director Malone, had any knowledge of plaintiff's EEOC complaint. The temporal proximity of plaintiff's EEOC complaint and the Panel recommendation, without more, does not raise a genuine issue of material fact whether Dr. Rao's retaliatory motive was the but-for cause of the final salary decision. Defendant is therefore entitled to summary judgment on plaintiff's claim that defendant retaliated against her for protected opposition when it determined her 2006 raise.

### b. July 16, 2007 Incident

Plaintiff must establish a causal connection between her EEOC charges on December 20, 2005, August 11, 2006 and December 26, 2006 and the July 16, 2007 incident regarding the CDs. More than six months elapsed between plaintiff's EEOC charge on December 26, 2006 and the incident on July 16, 2007; thus, temporal proximity does not raise a genuine issue of material fact regarding causation. Moreover, plaintiff does not controvert the fact that she was not authorized to burn the CDs or that the VA was justified in issuing a Written Counseling. Although plaintiff argues that Dr. Rao somehow orchestrated her confrontation with Murphree, defendant correctly pointed out at oral argument that it was plaintiff's response to Murphree's investigation which created the physical confrontation. No reasonable jury could find any nexus between the CD incident and plaintiff's protected opposition.

**IT IS THEREFORE ORDERED** that <u>Defendant's Motion For Summary Judgment</u>

(Doc. #74) filed February 19, 2013 be and hereby is **SUSTAINED.**

Dated this 3rd day of September, 2013, at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u><br>
Kathryn H. Vratil<br>
United States District Judge